## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:20-CR-00058 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| LUIS GARCIA | ) | JULY 28, 2023 |
| | ) | |
| | ) | |

## MEMORANDUM OF DECISION
### RE: MOTION TO SUPPRESS (ECF NO. 571)

Kari A. Dooley, United States District Judge

In September of 2018, officers of the Bridgeport Police Department seized one Apple iPhone from the person of Defendant Luis Garcia ("Garcia" or "Defendant") pursuant to a search warrant issued by a Connecticut Superior Court judge. By motion dated December 23, 2022, Garcia seeks to suppress the fruits of all searches of the seized iPhone on the grounds that the search warrant did not comport with the requirements of the Fourth Amendment insofar as it was unsupported by probable cause, insufficiently particularized, and unconstitutionally overbroad. The Government opposes the motion to suppress, arguing that the warrant was not constitutionally defective and that, even if it was, the good faith exception to the exclusionary rule precludes suppression. For the reasons that follow, Garcia's motion to suppress the iPhone and the data extracted therefrom, ECF No. 571, is GRANTED.

## FACTUAL BACKGROUND

The Court assumes the parties' familiarity with the underlying facts and recites only those necessary to resolve the pending motion to suppress. The following facts, undisputed for purposes of this motion, are summarized from the parties' memoranda and the warrant application package at issue here.

On August 13, 2018 at approximately 12:28 a.m., a shooting took place in the East End of Bridgeport, Connecticut at the intersection of Stratford Avenue and Union Avenue. Def.'s Mem. in Supp. Mot. to Suppress ("Def.'s Mem.) at 1, ECF No. 571-1; Gov's Mem. in Opp'n ("Gov.'s Opp'n") at 39, ECF No. 596. Upon arrival at the scene, officers discovered a red Buick sedan with two victims inside: Len Smith and Georgia Camargo. Gov.'s Opp'n at 39. Both victims were transported to the hospital, where Len Smith ultimately succumbed to his injuries and was pronounced dead at 1:07 a.m. *Id.*

Detectives from the Bridgeport Police Department began an investigation that night and reviewed city surveillance footage from the area of the shooting. *Id.* In the footage, detectives observed what appeared to be a white Jeep Grand Cherokee containing multiple occupants pull up alongside the Buick and fire multiple shots into the Buick from the Jeep's passenger side, hitting both people in the Buick. *Id.* at 39–40; *see* Def.'s Mem. at 2. The Jeep thereafter sped off, and later that evening was set on fire at Indian Wells State Park in Shelton, Connecticut. Def.'s Mem. at 2.

In the days following the murder, detectives identified several suspects believed to have been involved in the theft of the Jeep, the shooting, and/or the arson of the Jeep. *Id.*; Gov.'s Opp'n at 40. One of those suspects was Shakale Brantley,[1] who was interviewed by police on August 20, 2018, but allegedly provided very little information regarding the crimes under investigation and implicated no one other than Henry Floy, another defendant in this case. Gov.'s Opp'n at 40. On September 4, 2018, detectives again interviewed Brantley after executing a search warrant for Brantley's DNA. *Id.*; *see* Gov. Ex. 9 at 1, ECF No. 600-9. During that interview, Brantley

---

[1] Garcia takes issue with the Government's assertion that "[o]ne such suspect" identified in the investigation "was Shakale Brantley," Gov.'s Opp'n at 40, arguing that "[t]he Government fails to mention, as did the detectives in their warrant affidavit, that the detectives were aware of Brantley through interviewing Henry Floy," Def.'s Reply at 1–2, ECF No. 630. The Court takes up this argument, *infra* p. 11 and note 3, when discussing Garcia's argument that the warrant affidavit contained material omissions that invalidated any finding of probable cause by the issuing judge.

purportedly "provided a more fulsome account of what transpired the night Len Smith was killed," including implicating himself in the destruction of evidence used in the homicide and identifying three individuals who were in the Jeep when the homicide occurred: Lorenzo Carter, Ta'ron Pharr, and Luis Garcia. Gov.'s Opp'n at 41.

Thereafter, Bridgeport Police Department Detectives Heanue and Cintron applied to the Connecticut Superior Court for a warrant to search Garcia's person.[2] *Id.*; *see* Def.'s Mem. at 3. The warrant application, including its supporting affidavit, was prepared on the State of Connecticut's standard warrant application Form JD-CR-61. *See* Gov. Ex. 10 ("Garcia Warrant Appl."), ECF No. 600-10. On the first page of the application, the detectives sought permission to search "Luis Garcia's [date of birth omitted] person, to search him and seize all electronic devices to include all cellular phones," affirming that they had probable cause to believe that evidence of the offense of "Murder 53a-54a" would be found. *Id.* at 1.

The next two pages of the application package contained an eleven-paragraph affidavit attested to by Detectives Cintron and Heanue. *Id.* at 2–3. The first two paragraphs of the affidavit briefly summarize the detectives' experience as members of the Bridgeport Police Department and note that the facts alleged in the affidavit "are stated from personal knowledge and observations as well as information received from other police officers acting in their official capacity, and from official police reports and statements made by prudent and credible witnesses." *Id.* at 2. The third, fourth, and fifth paragraphs provide a short summary of the August 13th homicide and describe the Bridgeport Police Department's investigation of the homicide. *Id.* The detectives aver that, in

---

[2] It is unclear on precisely what date the Detectives applied for the warrant. The application is dated August 5, 2018 by Detective Cintron, while it is dated August 20, 2018 by Detected Heanue. However, as Defendant observes, the homicide did not take place until August 13, 2018 and Defendant was not implicated in the murder by Brantley until September 4, 2018. *See* Def.'s Mem. at 3 n.2. Thus, the Court assumes those dates listed on the warrant application are in error.

reviewing surveillance cameras in the area of the shooting, they observed the white Jeep pull up alongside the red Buick and observed "[m]ultiple occupants wearing what appears to be blue colored gloves . . . firing weapons from the passenger side of the Jeep Grand Cherokee into the Buick striking the two victims." *Id.*

In the sixth, seventh, and eighth paragraphs—which Garcia describes as the "meat" of the affidavit—the detectives note that Shakale Brantley came to be a suspect in the homicide and provided a statement to the police on September 4, 2018. *Id.* at 2–3; *see* Def.'s Mem. at 9. The affidavit summarized Brantley's statement as follows:

> Brantley stated that shortly after the homicide occurred, (08/13/2018 at 0030 hours) he was with his friend Jamar Traylor, who was contacted by Ta'ron Pharr, Lorenzo Carter, and Luis Garcia. The aforementioned persons wanted to get picked up somewhere on the north end of Bridgeport. Brantley knows all three persons mentioned from the neighborhood. Brantley picked them up in his vehicle.
>
> While driving, all three passengers discussed burning the stolen white Jeep that was just used in a homicide. Luis Garcia talked about being the front passenger in the stolen Jeep and shooting at a parked Buick on the east end of Bridgeport (consistent with the vehicle the victims were in). Luis Garcia further said that he fired his gun into the parked Buick's back passenger side window. Brantley stated that after burning the stolen Jeep in Shelton CT, he drove Garcia back to Bridgeport. On the way back to Bridgeport, they pulled over at an unknown street in Shelton where Garcia threw spent shell casings down a sewer drain.

Garcia Warrant Appl. at 3. The affidavit describes Garcia as currently under the supervision of the Norwalk Office of the State of Connecticut Adult probation, with whom Garcia lists a cellular number ending in -5061. *Id.* Finally, the affidavit provides:

> Your affiants believe that Luis Garcia's cellular phone contains information that can aid investigators in the furtherance of this homicide investigation. Furthermore, your affiants know, that people who commit crimes often communicate with their co-conspirators, before, during and after the commission of such crimes. The most common method of communications is through cellular phones.

4

> Therefore, your affiants are respectfully requesting that a search warrant be issued for Luis Garcia's [date of birth omitted] person, to search him and seize all electronic devices to include all cellular phones. Your affiants further request that any seized communication devices be forensically examined, and its contents downloaded by Det. James Kennedy or any agency certified and capable of conducting such examinations.

*Id.*

The fifth page of the warrant application package was a signed, but otherwise blank form entitled "Affidavit Requesting Dispensation With Requirement of Delivery pursuant to § 54-33c, Connecticut General Statutes." *Id.* at 5.

On September 5, 2018, a Connecticut Superior Court judge authorized the search warrant, which appears on the sixth page of the warrant application package. *Id.* at 6. The warrant authorized the search of "Luis Garcia's [date of birth omitted] person, to search him and seize all electronic devices to include all cellular phones." *Id.* The warrant further indicated, "[y]our affiants further request that any seized communication devices be forensically examined, and its contents downloaded by Det. James Kennedy or any agency certified and capable of conducting such examinations." *Id.* The warrant granted the request to dispense with Conn. Gen. Stat. § 54-33c's requirement that a copy of the warrant application and affidavit in support of the warrant be given to the subject of the warrant at the time of its execution, and permitted the nondelivery of such documents for a period not to exceed 10 days. *See id.* Significant here, nowhere on the face of the warrant itself was the crime or crimes for which evidence was being sought identified. *See id.*

Soon thereafter, Detective Cintron executed the warrant to search Garcia's person and seized "one I Phone 5 model #A1453" and "One flash drive containing Garcia phone data" pursuant to the search. *See id.* at 7. Garcia represents that "sometime thereafter, [the phone] was handed over to the FBI for extraction and analysis." Def.'s Mem. at 4. The FBI allegedly downloaded the entire contents of the phone, and Garcia represents that "it appears that Mr.

Garcia's phone contained 331,346 files which were available to law enforcement authorities for review based upon the September 5, 2018 warrant." *Id.* at 5.

**STANDARD OF REVIEW**

The Fourth Amendment of the United States Constitution prohibits "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The chief evil that prompted the framing and adoption of the Fourth Amendment was the 'indiscriminate searches and seizures' conducted by the British 'under the authority of general warrants.'" *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (quoting *Payton v. New York*, 445 U.S. 573, 583 (1980)). "To prevent such general, exploratory rummaging in a person's belongings and the attendant privacy violations, the Fourth Amendment provides that a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Id.* (internal citations and quotations omitted).

**Probable Cause**

"To be lawful under the Constitution, a search warrant must, *inter alia*, set forth evidence establishing probable cause to believe a crime has been committed and that evidence of that crime can be found in what is to be searched." *United States v. Weigand*, 482 F. Supp. 3d 224, 240 (S.D.N.Y. 2020). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Although the probable cause standard "does not demand 'hard certainties' . . . it does require more than a 'hunch.'" *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (quoting *Gates*, 462 U.S. at 238, and *Terry v. Ohio*, 392 U.S. 1, 22,

27 (1968)). Therefore, "[i]n determining whether probable cause exists to support the issuance of a warrant, a judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Boles*, 914 F.3d 95, 102 (2d Cir. 2019) (cleaned up). This decision "must be grounded in sufficient facts to establish the sort of 'fair probability' on which 'reasonable and prudent men, not legal technicians, act.'" *Lauria*, 70 F.4th at 128 (quoting *Gates*, 462 U.S. at 231, 238, 241).

A court reviewing an issuing judge's finding of probable cause "must accord considerable deference to the probable cause determination." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007); *see also Gates*, 462 U.S. at 236 ("[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." (internal quotations omitted)). The reviewing court's task "is simply to ensure that the totality of the circumstances afforded the [issuing judge] 'a substantial basis' for making the requisite probable cause determination." *United States v. Thomas*, 788 F.3d 345, 350 (2d Cir. 2015) (quoting *Gates*, 462 U.S. at 238). Additionally, the issuing judge's "finding of probable cause is itself a substantial factor tending to uphold the validity of [a] warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). In the end, any doubts that remain "should be resolved in favor of upholding the warrant." *Id.*

**Particularity & Overbreadth**

The Warrants Clause both "requires particularity and forbids overbreadth." *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009). "The manifest purpose of this particularity requirement was to prevent general searches." *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir.

2020) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). By ensuring that a warrant is sufficiently specific, the particularity requirement ensures that a warrant "does not 'leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized.'" *United States v. Conley*, 342 F. Supp. 3d 247, 270 (D. Conn. 2018) (quoting *United States v. Wey*, 256 F. Supp. 3d 355, 380 (S.D.N.Y. 2017)).

Thus, "[t]o be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements. First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Finally, the warrant must specify the items to be seized by their relation to designated crimes." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (internal citations and quotations omitted). "A warrant is facially unconstitutional if it fails to comply with any of these requirements." *Purcell*, 967 F.3d at 178. Specificity in a warrant's application or other supporting documents generally cannot cure the constitutional defects of an unparticularized warrant because "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." *Id.* at 179 (quoting *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)). "However, 'a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant.'" *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 99–100 (2d Cir. 2016) (quoting *Groh*, 540 U.S. at 557–58).

"[A] search warrant does not necessarily lack particularity simply because it is broad." *Ulbricht*, 858 F.3d at 100. However, a warrant that comports with the Fourth Amendment's particularity requirements may nevertheless be overbroad where the "description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (quotations omitted). Although frequently conflated, "breadth and

particularity are related but distinct concepts," *Ulbricht*, 858 F.3d at 102, and "[t]he doctrine of overbreadth represents . . . an intersection point for probable cause and particularity," *Conley*, 342 F. Supp. 3d at 271 (quoting *Wey*, 256 F. Supp. 3d at 382). Thus, "an unparticularized description of the items subject to search under a warrant may result in the warrant exceeding the scope of established probable cause." *Conley*, 342 F. Supp. 3d at 271. "In other words, a warrant is overbroad if the description of items to be searched or seized is broader than the limits imposed by the probable cause justifying the warrant." *Id.*

**Good Faith & The Exclusionary Rule**

"The Fourth Amendment 'contains no provision expressly precluding the use of evidence obtained in violations of its commands.'" *Wey*, 256 F. Supp. 3d at 394 (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). The Supreme Court has nevertheless "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial," in order to "safeguard Fourth Amendment rights generally through its deterrent effect." *Herring v. United States*, 555 U.S. 135, 139–40 (2009). However, "[a] violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule" as "'exclusion has always been [a court's] last resort, not [a] first impulse.'" *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) (quoting *Herring*, 555 U.S. at 140).

"Application of the exclusionary rule depends on the efficacy of the rule in deterring Fourth Amendment violations in the future as well as a determination that the benefits of deterrence outweigh the costs." *Id.* at 64 (cleaned up). Moreover, "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.* (quoting *Herring*, 555 U.S. at 143). Thus, the exclusionary rule's deterrence value "justifies its cost when police exhibit deliberate, reckless, or grossly negligent disregard for Fourth

Amendment rights." *United States v. Raymonda*, 780 F.3d 105, 117–18 (2d Cir. 2015) (quotations omitted). Conversely, "when police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence," exclusion is not warranted because there is "nothing to deter." *Id.* (quotations omitted).

Accordingly, "the good-faith exception to the exclusionary rule applies when an officer 'genuinely believes that he has obtained a valid warrant from a magistrate judge and executes that warrant in good faith,' as long as the officer's reliance on the warrant is 'objectively reasonable.'" *Conley*, 342 F. Supp. 3d at 273 (quoting *Raymonda*, 780 F.3d at 118). "The government bears the burden of 'demonstrat[ing] the objective reasonableness of the officers' good faith reliance' on an invalidated warrant.'" *United States v. Sandalo*, No. 21-708-CR, 2023 WL 3885805, at *2 (2d Cir. June 8, 2023) (summary order) (quoting *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011)). And while an officer's reliance on a warrant is entitled to a "presumption of reasonableness," *id.* (quotation omitted), the Supreme Court has identified four circumstances in which the good-faith exception will not apply:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)).

**DISCUSSION**

Garcia seeks to suppress his cell phone and the data extracted therefrom on the grounds that the September 5th search warrant violated the Fourth Amendment. Specifically, Garcia argues that the warrant was unsupported by probable cause, insufficiently particularized, and unconstitutionally overbroad. Def.'s Mem. at 1. In response, the Government argues that the

warrant complied with all of the requirements of the Fourth Amendment, and, even if it did not, the good faith exception to the exclusionary rule applies and therefore suppression is not warranted. Gov.'s Opp'n at 43. The Court agrees with Garcia.

**The Warrant Was Not Supported By Probable Cause**

Garcia advances two arguments as to why the warrant was unsupported by probable cause: first, that the warrant's supporting affidavit contained material omissions that, if included, would have undermined the issuing judge's finding of probable cause,[3] Def.'s Mem. at 7; and second, that even without including the allegedly omitted information, the warrant was unsupported by sufficient indicia of probable cause to believe that evidence of the homicide or any other crime would be found on Garcia's phone, *see id.* at 11–14. The Court need not reach the former issue as the Court agrees with Garcia that even without including the omitted information, the application did not provide the issuing judge with a substantial basis to conclude that there was probable cause to search Garcia's cell phone.

As noted above, the "meat" of the two-page Affidavit provided:

> Brantley stated that shortly after the homicide occurred, (8/13/2018 at 0030 hours) he was with his friend Jamar Traylor, who was contacted by Ta'ron Pharr, Lorenzo Carter, and Luis Garcia. The aforementioned persons wanted to get picked up somewhere on the north end of Bridgeport. Brantley knows all three persons mentioned from the neighborhood. Brantley picked them up in his vehicle.

---

[3] Specifically, Garcia alleges that the September 5th warrant's affidavit omitted material information because it failed to include that, during interviews conducted by Bridgeport police officers during the homicide investigation, four witnesses failed to implicate Garcia in the homicide. *See* Def.'s Mem. at 8–11. One of those witnesses was Shakale Brantley, whose second interview—which did implicate Garcia in the homicide—was used to provide the primary factual basis supporting the probable cause to search Garcia in the warrant's supporting affidavit. *See id.* at 9–11; Garcia Warrant Appl. at 2–3. Garcia represents that not only did two other witnesses fail to implicate him in the homicide, but those witnesses identified Brantley instead of Garcia as one of the individuals involved in the homicide. Def.'s Mem. at 9–10. Garcia contends these omissions were material and therefore undermine the probable cause for the warrant because they cast doubt on Garcia's involvement in the homicide and "place[] blame for the homicide squarely upon the only person whom the officers relied upon in the warrant application—Brantley." *Id.* As indicated, the Court need not reach this issue given the failure of the application to establish probable cause or otherwise meet the requisites for issuance under the Fourth Amendment.

> While driving, all three passengers discussed burning the stolen white Jeep that was just used in a homicide. Luis Garcia talked about being the front passenger in the stolen Jeep and shooting at a parked Buick on the east end of Bridgeport (consistent with the vehicle the victims were in). Luis Garcia further said that he fired his gun into the parked Buick's back passenger side window. Brantley stated that after burning the stolen Jeep in Shelton CT, he drove Garcia back to Bridgeport. On the way back to Bridgeport, they pulled over at an unknown street in Shelton where Garcia threw spent shell casings down a sewer drain.
>
> . . .
>
> Your affiants believe that Luis Garcia's cellular phone contains information that can aid investigators in the furtherance of this homicide investigation. Furthermore, your affiants know, that people who commit crimes often communicate with their co-conspirators, before, during and after the commission of such crimes. The most common method of communications is through cellular phones.

*See* Garcia Warrant Appl. at 3.

The Government relies in part upon the information in the affidavit that provides reason to believe that Garcia was involved in the Len Smith homicide to argue that, viewed through the lens of common sense, probable cause to search Garcia's cell phone is manifest. *See* Gov.'s Opp'n at 44–45. However, the relevant inquiry to the issuing judge in determining whether probable cause existed was not whether there was a fair probability that Garcia committed a crime, but whether "there [was] a fair probability that contraband or evidence of a crime will be found *in a particular place.*" *Boles*, 914 F.3d at 102 (emphasis added) (quotations omitted); *see Lauria*, 70 F.4th at 130 n.14 ("In other search contexts, this court has cautioned against confusing a fair probability that contraband or evidence of a crime will be found in a particular place with probable cause to think that the person whose premises are to be searched is implicated in the crime." (quotations omitted)). Of course, "[t]his is not to ignore the fact that probable cause as to a person's criminal conduct can sometimes *inform* probable cause to search a place used or frequented by that person

or to obtain records for electronic devices linked to that person." *Lauria*, 70 F.4th at 130 n.14 (emphasis added). But where, as here, the affidavit merely alleged facts supporting an inference that Garcia committed the crime, but provided no factual basis whatsoever to believe that evidence of that crime would be found on Garcia's cell phone, there is not a substantial basis for the issuing judge to conclude that there was probable cause to search the phone. *Cf. United States v. Gomez*, 652 F. Supp. 461, 462 (E.D.N.Y. 1987) ("[I]t cannot follow . . . simply from the existence of probable cause to believe a suspect guilty, that there is also probable cause to search his residence." (quoting *United States v. Valenzuela*, 596 F.2d 824, 828 (9th Cir. 1979))).

Coupling the information as to Garcia's involvement in the homicide with the statement that "your affiants know, that people who commit crimes often communicate with their co-conspirators, before, during and after the commission of such crimes" and that "[t]he most common method of communications is through cellular phones," Garcia Warrant Appl. at 3, does not change the calculus absent some factual allegations from which an inference could be drawn that Garcia's cell phone would contain such communications or other evidence. Although an affiant officer's expert opinion "is an important factor to be considered by the judge when making a probable cause determination," *United States v. Benevento*, 836 F.2d 60, 71 (2d Cir. 1987) (internal quotations omitted), *abrogated on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989), the officer's opinion, standing alone, is generally not "sufficient to establish a link between the item to be searched and the alleged criminal activity," *United States v. Ukhuebor*, No. 20-MJ-1155 (LDH), 2021 WL 1062535, at *3 (E.D.N.Y. Mar. 19, 2021); *see also United States v. Guzman*, No. 97-CR-786 (SAS), 1998 WL 61850, at *4 (S.D.N.Y. Feb. 13, 1998) ("Permitting a search warrant based solely on the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague

warrants authorizing virtually automatic searches of any property used by a criminal suspect." (internal quotations omitted)). Rather, a warrant application must contain "enough case-specific evidence to nudge [an officer's] training and experience across the line from sheer speculation to probable cause." *See United States v. Garlick*, No. 22-CR-540 (VEC), 2023 WL 2575664, at *6 (S.D.N.Y. Mar. 20, 2023).[4] The Court concludes that the affiants' blanket generalization about how "people who commit crimes" act here was not sufficient to "nudge" the affidavit over the line and establish probable cause to search Garcia's cell phone.

In this vein, the Government argues that facts alleged in the affidavit—such as the fact that the perpetrators were all wearing blue gloves and that Brantley was "contacted by Ta'ron Pharr, Lorenzo Carter, and Luis Garcia," who wanted to be picked up from the North End of Bridgeport, allows the inference "that the crime was premeditated and coordinated" and "that the perpetrators of the murder had cell phones at their disposal around the time of the shooting and had used them to reach out for assistance and coordinate transportation." Gov.'s Opp'n at 44–47.

Although the Court gives substantial deference to the probable cause finding of the issuing judge and recognizes that the issuing judge may rely on common sense in making such a determination, the limited information presented here requires too far an inferential leap. The mere allegation that the three supposed perpetrators "contacted" Brantley shortly after the crime asking to be picked up from an area where the crime was not even committed provides little probability that *information relating to the crime* would be contained on *Garcia's* phone, specifically.

---

[4] Although some courts have held that in the context of drug trafficking and narcotics offenses, probable cause to search a cell phone may be established by the mere fact that a cell phone was found at or near the scene of the crime when coupled with attestations made by narcotics investigators based on their knowledge and experience, such conclusions are based on the fact that the association between cell phones and narcotics trafficking is pervasive and long established, such that cell phones are essentially the "tools of the trade." *See United States v. Robinson*, No. 16-CR-545 (S-3)(ADS), 2018 WL 5928120, at *16 (E.D.N.Y. Nov. 13, 2018) (collecting cases); *United States v. Simmonds*, No. 5:13-CR-42, 2014 WL 1706296, at *8 (D. Vt. Apr. 29, 2014) (collecting cases supporting the proposition that "[c]ell phones are generally recognized as tools of the illegal drug dealing trade"), *aff'd*, 641 F. App'x 99 (2d Cir. 2016). The same cannot be said of cell phones and homicide.

Likewise, that the perpetrators allegedly coordinated their gloves does not raise a fair probability that they communicated their plans via *cell phones*. Indeed, to issue a warrant on the basis of evidence suggesting minimal amounts of coordination between co-conspirators "would be to license virtually automatic searches" of the cell phones of any persons suspected of engaging in criminal conspiracies. *See Gomez*, 652 F. Supp. at 463.

In short, nothing in the above-quoted portion of the affidavit, nor anywhere in the warrant application package, provides any facts upon which the issuing judge could find that there was a fair probability that contraband or evidence of the crime in question—homicide—would be found on *Garcia's cell phone*. Indeed, nowhere in the affidavit's summary of the facts before, during, or after the homicide are cell phones or other electronic devices even mentioned.[5] Thus, even giving substantial deference to the issuing judge's finding of probable cause, the affidavit provided an insufficient basis to believe that evidence of the homicide would be found on Garcia's phone. The Court therefore finds that the warrant was unsupported by probable cause.

Supporting this conclusion is the Second Circuit's recent decision in *Lauria*, 70 F.4th 106. There, the defendant, Molina, was alleged to have participated in several armed robberies with, among others, Lauria. *Id.* at 112. Molina challenged the district court's denial of his motion to suppress phone records—cell site data—tying him to the robberies. *Id.* at 114–18. In assessing whether the warrant application established probable cause to search those records, the Second Circuit first created the "corrected affidavit," accounting for and eliminating factual errors in the

---

[5] Of course, the requisite showing to establish probable cause to search the phone is not, as Garcia appears to contend, that Garcia "used his phone in connection with the alleged offense," Def.'s Reply at 6 n.4, but rather whether there is a fair probability that "evidence of a crime will be found" on the phone, *see Boles*, 914 F.3d at 102. However, inherent in this standard is the requirement that there be some nexus between the item to be searched and the crime under investigation that can support finding a fair probability that evidence of the crime will be found in the item. *See United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) ("This required nexus between the items sought and the particular place to be searched protects against the issuance of general warrants, instruments reviled by the Founders who recalled their use by Crown officials to search where they pleased." (internal quotations omitted)).

warrant application. *Id.* at 125–26. After doing so, the only facts relating to Molina or his cell phone were (1) that Molina was Facebook "friends" with Lauria, and (2) that Molina's phone had been in communication with Lauria's phone "shortly before" one of the robberies. *Id.* at 129. The court found that "[t]hese facts are insufficient to demonstrate a 'reasonable probability' that the sought months of records for Molina's . . . cell phone would contain evidence pertaining to the . . . Robberies." *Id.* The court reasoned that "[t]he mere fact that persons know each other does not make it probable that they are criminal confederates." *Id.* More importantly, with regard to the communication from Molina's phone, the court found that "that fact is insufficient to warrant the production of months of detailed [cell site data] for [Molina's] cell phone," reasoning that:

> That conclusion is reinforced by what the affidavits do not say about this communication. They do not say whether Lauria's -3972 cell phone or Molina's -2454 cell phone initiated the call. They do not indicate what the affiant means by "shortly before" the robbery, a point that takes on added significance when the original misstated February 19, 2019 date is corrected to reference the entire month of February 2019. They do not indicate how many calls these two cell phones made on the date they communicated with each other. If Lauria's -3972 cell phone initiated the call within minutes of the robbery, and made and received few other calls around that time, that might provide a reasonable basis to think it probable that the subject of the call was the robbery and that the call recipient was a confederate in the crime. But that probability diminishes as the call becomes more temporally remote from the crime and as the number of calls placed and received increases.

*Id.* at 130.[6] The court was also troubled by the breadth and subject matter of the warrants, which "authorized disclosure of minute-by-minute location data for Molina's -2454 cell phone for six weeks in 2017 and six weeks in 2019 . . . and for over four months in 2019." *Id.* at 128. The court

---

[6] Similarly, the affidavit here is striking for what it does not say. It does not identify who specifically called Brantley, nor does it include any information as to Garcia's phone records and what they might have revealed (presumably because the police had not sought such records). Nor does the warrant include the fact that this homicide investigation was part of a broader investigation into gang violence in the Bridgeport area. It did not include any information regarding the gang's prolific use of social media (and by inference their cell phones) to document their offenses, information which has appeared elsewhere in the various search warrant applications in this case.

noted that "[t]his calls for some caution in assessing probable cause because, as the Supreme Court has observed, modern cell phone usage is so ubiquitous that this type of location information can reveal not only nearly the whole of an individual's movements but also, in the process, much about his personal and professional life." *Id.* at 129–30.

Here, the warrant application and affidavit contained similarly deficient indicia of probable cause to that presented in *Lauria*. The affidavit here merely provided that Brantley was "contacted" by three individuals, one of whom was Garcia. This is even less illuminating than the affidavit in *Lauria*, which at least provided that communications were exchanged between *the defendant and one of the alleged perpetrators*. *See id.* If communications between a defendant's and perpetrator's phones are insufficient to establish probable cause to obtain a limited subset of cell phone records, then a single communication, which may or may not have been via cell phone, made by one of three people, one of whom was the Defendant, is certainly not sufficient to access the entire contents of the Defendant's phone. Finally, the *Lauria* court's concern regarding the breadth of the warrant when assessing probable cause is equally applicable here. The warrant sought not simply evidence of communications during or in temporal relation to the homicide, but rather, the entirety of the cell phone's contents.

Thus, the Court finds that the September 5th warrant was unsupported by probable cause.

**The Warrant Was Insufficiently Particularized**

Garcia next argues that that warrant failed to satisfy the first and third prongs of the particularity requirement because it failed to: 1) identify the specific offense for which the police had established probable cause, and 2) specify the items to be seized by their relation to designated crime.[7] *See* Def.'s Mem. at 11–14; Def.'s Reply at 7–9. The Court agrees with Garcia's first

---

[7] The Court notes that Garcia raised the former argument for the first time in his Reply memorandum. *See* Def.'s Reply at 7–9. Generally, the Court would not entertain an argument raised in such posture without providing the Government

argument and does not reach the second argument because the warrant is, in any event, so facially defective that the good faith exception will not apply. *See infra* pp. 21–25.

Garcia observes that the search warrant on its face did not identify the homicide as the crime for which evidence was being sought. Def.'s Mem. at 7–8. He is correct. In fact, the warrant does not identify any offense at all. *See* Garcia Warrant Appl. at 6. The Second Circuit has routinely stated that to be sufficiently particularized, a warrant "must identify the alleged crime for which evidence is sought." *In re 650 Fifth Ave.*, 830 F.3d at 99. Thus, the warrant runs afoul of the first prong of the particularity requirement.

The Government argues that the warrant's facial deficiencies may nevertheless be cured by referring to the information contained in the warrant's supporting application and affidavit. *See* Gov.'s Opp'n at 23–26. However, "the Fourth Amendment 'requires particularity in the warrant, not in the supporting documents.'" *Wey*, 256 F. Supp. 3d at 381 (quoting *Groh*, 540 U.S. at 557). Nevertheless, "a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, *and* if the supporting document accompanies the warrant." *In re 650 Fifth Ave.*, 830 F.3d at 99–100 (emphasis added) (quoting *Groh*, 540 U.S. at 557–58). The Second Circuit has recently decided in a summary order that *both* incorporation and accompaniment are required.[8] *Sandalo*, 2023 WL 3885805, at *2. Examining a

---

[7] with an opportunity to respond. However, because the same argument has been raised and thoroughly briefed by a codefendant and the Government has had a substantial opportunity to respond to the argument in its omnibus brief, the Court considers the argument here. *See* Gilbert's Mem. in Supp. of Mot. to Suppress at 25–29, ECF No. 469; Gov.'s Opp'n at 23–26.

[8] Although both the Supreme Court in *Groh* and the Second Circuit in *In re 650 Fifth Avenue* have used the conjunctive "and" when stating that a warrant may be construed by reference to its supporting materials "if the warrant uses appropriate words of incorporation, *and* if the supporting document accompanies the warrant," *In re 650 Fifth Ave.*, 830 F.3d at 99–100 (emphasis added) (quoting *Groh*, 540 U.S. at 557–58), neither *Groh* nor *In re 650 Fifth Avenue* explicitly held that *both* incorporation and attachment were required because in both cases the warrants' supporting materials were *neither* incorporated by *nor* attached to the warrants themselves. *See United States v. Cooper*, No. 1:18-CR-00126 EAW, 2019 WL 6167235, at *3 n.2 (W.D.N.Y. Nov. 20, 2019) (assuming, without deciding, that "*Groh* requires that the Fourth Amendment's particularity requirements are only satisfied when the copy of the warrant left at the place of execution included the incorporated affidavit"); *State v. Browne*, 291 Conn. 720, 735 (2009) ("*Groh* is ambiguous, however, on whether the fourth amendment requires an otherwise incorporated warrant application and

similar warrant prepared using the same standard State of Connecticut warrant application packet,[9] the court held that the warrant successfully incorporated the supporting application and affidavit, but that "the warrant remain[ed] constitutionally defective" because the "documents were not 'attached' in the legally relevant sense; they were not included with the search warrant when it was presented to [the defendant]." *Id.* at *2–3.

Just as in *Sandolo*, the warrant at issue here successfully incorporated the supporting affidavit and application, however the documents were not attached to the warrant at the time the warrant was executed. Rather, the documents were withheld for a period of 10 days pursuant to Conn. Gen. Stat. § 54-33c. Accordingly, the Court may not resort to the affidavit or application to cure this facial defect in the search warrant.[10]

**The Warrant Was Overbroad**

Finally, Garcia argues that the warrant was unconstitutionally overbroad because it authorized the search of contents of the cell phone that fell well beyond any probable cause that the warrant application established. *See* Def.'s Mem at 14–19. As discussed above, the Court finds that the warrant had insufficient indicia of probable cause to support the search at all. However, even had the Court deferred to the issuing judge's finding of probable cause, reading the supporting

---

affidavit to accompany the warrant at the time of execution."). And in *In re 650 Fifth Avenue*, even though the warrant application was concededly not attached to the warrant, the Second Circuit went on to assess whether the application was adequately incorporated by reference, an analysis which would have been unnecessary if both incorporation and attachment are required to meet the particularity requirement. *See* 830 F.3d at 101. Likewise, the Connecticut Supreme Court has determined that under some, albeit limited, circumstances, incorporation alone is sufficient even if the application is not attached. *See Browne*, 291 Conn. at 737. Although not a precedential opinion, the Court accepts *Sandolo* as the Circuit Court's clarified assessment of the issue.

[9] In an accompanying precedential decision released the same day, the Second Circuit included a scanned copy of the search warrant at issue. *See United States v. Sandolo*, 70 F.4th 77, 93–99 (2d Cir. 2023).

[10] Although the Court does not reach Garcia's additional argument regarding whether the warrant set forth the items to be seized with sufficient particularity (or perhaps was overbroad), it is worth noting that identifying the entirety of the phone's contents as subject to search, where the only allegation of items for which probable cause might be developed is "communications" in temporal proximity to the homicide, is, in the Court's view, problematic. *See Ulbricht*, 858 F.3d at 99–100 ("[W]arrants that fail to 'link [the evidence sought] to the criminal activity supported by probable cause' [will] not satisfy the particularity requirement because they 'lack[] meaningful parameters on an otherwise limitless search' of a defendant's electronic media." (quoting *Rosa*, 626 F.3d at 62)).

affidavit most favorably to such a determination, the warrant could only conceivably be read to confer probable cause to search the phone for evidence of communications in reasonable temporal proximity to the homicide. However, the warrant was not restricted to evidence of communications, nor was it even restricted to the cell phone that Garcia was alleged to own at the time of the homicide. Rather, it allowed for the search of the entire contents of any "electronic devices" found on Garcia's person without any temporal or subject matter limitations. This authorization of the complete extraction of any and all data on the phone allowed the search and seizure of information well beyond any possible probable cause that could have conceivably been established by the warrant's supporting materials. *See Sandalo*, 2023 WL 3885805, at *2 (finding a warrant overbroad where it allowed the search of areas for which "there was no reason to believe had any connection to [the defendant's] criminal activity" and had "no temporal restraints tying categories of items to be seized to any designated crimes committed during the relevant periods of investigation"); *see also Lauria*, 70 F.4th at 128 (noting that the determination of whether probable cause exists is "informed by the breadth of the search authorization sought").[11] Such an all-encompassing search of a modern cell phone—which has the capacity to contain vast troves of information about all aspects of a person's life from the "mundane to the intimate"—without almost no indicia of probable cause to support the scope of the search cannot be countenanced. *See, e.g.*, *Riley v. California*, 573 U.S. 373, 393–97 (2014) (detailing the ways in which "[c]ell phones differ in both a quantitative and a qualitative sense" from other objects that might be found on a person subject to a search because of their immense storage capacity).

---

[11] Indeed, *Lauria* is demonstrative of the notion that overbreadth lies at the intersection between probable cause and particularity, finding that the "sparse facts" put forth in the warrant and its supporting documents "d[id] not admit the probable cause findings necessary to support" the breadth of the challenged warrants. 70 F.4th at 130.

Accordingly, even if the warrant had been supported by probable cause—which it was not—it nevertheless violated the Fourth Amendment because it was unjustifiably overbroad.

**The Good Faith Exception Does Not Apply**

The Government argues that, even if the Court finds that the warrant is defective, which the Court has, the data obtained from Garcia's cell phone should not be suppressed because the good faith exception to the exclusionary rule applies. Gov.'s Opp'n at 50–52. Garcia argues that the good faith exception should not apply because, pursuant to the fourth *Leon* scenario, the warrant was so facially defective that the detectives could not have reasonably relied upon it. Def.'s Reply at 10. The Court agrees with Garcia.

As discussed above, the Court has found that the warrant is facially defective because it was unsupported by sufficient indicia of probable cause, insufficiently particularized, and unconstitutionally overbroad—a trifecta of constitutional infirmities. "Not every facially deficient warrant, however, will be so defective that an officer will lack a reasonable basis for relying upon it." *Rosa*, 626 F.3d at 66. Rather, application of the fourth *Leon* scenario "depend[s] on the circumstances of the particular case." *In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147, 162 (2d Cir. 2019) (quoting *Leon*, 468 U.S. at 923). "The animating concern is whether the 'warrant [is] so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.'" *Id.* at 163 (quoting *Leon*, 468 U.S. at 923).

Courts have therefore generally applied the fourth *Leon* scenario where the search warrant was "glaringly deficient." *Id.*; *see also Groh*, 540 U.S. at 558 ("[T]he warrant was so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law."). For example, in *In re 650 Fifth Ave.*, the Second Circuit found that the good faith exception did not apply to a facially deficient warrant authorizing the seizure of a wide range of documents and

"[a]ny and all computers" and other forms of electronic media. 934 F.3d at 161 n.13. The Court

reasoned that the warrant was "glaringly" facially deficient because it "d[id] not even arguably

include a reference to the Claimants' alleged crimes or a temporal scope for the items to be seized,"

and that the unattached and unincorporated supporting affidavit could not remedy those

deficiencies because there was "no evidence that anyone on the search team reviewed the

[affiant's] affidavit before the search." *Id.* at 163–64. The Court also found significant the

"exceptionally broad" scope of the warrant, which resulted in "a team without particularized

knowledge of the proper scope of the search seiz[ing] over two hundred boxes of evidence and

several computers." *Id.* at 164. Finally, the Court found that the deterrent value of suppression was

high because "the fact that these glaring deficiencies survived the Government's typical process

for drafting, reviewing, and executing warrants indicates grossly negligent disregard for Fourth

Amendment rights." *Id.* (quotation omitted).[12]

Conversely, courts have found that the good faith exception will apply to save a facially

invalid warrant where the executing officers nevertheless conducted the search pursuant to the

warrant "in accordance with the appropriate limitations set forth in the unincorporated and

unattached supporting application or affidavit." *Sandalo*, 2023 WL 3885805, at *1 (citing *Rosa*,

626 F.3d at 64). For example, in *Sandalo*, the court applied the good faith exception where officers

executed a warrant for the search of an apartment that failed to identify the crime on its face and

was insufficiently particularized and overbroad because "the officers executing the search warrant

were clearly aware of and conducted the search according to the limitations set forth in the

application and affidavit." *Id.* at *2–3. Significantly, the affidavit in *Sandalo*, which was

incorporated by the warrant but not attached at the time of the warrant's execution, did not contain

---

[12] The Court recognizes that the Government had no role in the drafting processing or presenting of this warrant.

the same defects as the warrant itself, as it expressly excluded areas of the apartment that were outside of the scope of probable cause and limited the timeframe of the items to be seized to the relevant periods of investigation. *Id.* at \*3. Further, the warrant application specified the alleged crimes for which probable cause was established, the search team executing the warrant was led by one of the affiants, and the search team seized only items related to the crimes specified in the application and did not search areas falling outside of the scope of the warrant. *Id.*; *see also Rosa*, 626 F.3d at 64–65 (finding that the good faith exception applied to a warrant that did not set forth the nature of the suspected criminal activity where the affiant and officers executing the search were under substantial time pressures, the affiant was personally involved in the execution of the warrant, and the executing officers complied with the limits of the search as set forth in the warrant's supporting application).

The Court finds that the instant case is more akin to *In re 650 Fifth Ave.* The warrant here failed to include any reference to the alleged crime nor set a temporal scope for the information to be seized, and the probable cause—if any—supporting the warrant did not support the "exceptionally broad" scope of the information to be searched: all of the contents of any electronic devices found on Garcia's person. *See In re 650 Fifth Ave.*, 934 F.3d at 164. Further, although one of the affiants, Detective Cintron, was the officer that executed the search of Garcia's person, the cell phone obtained from that search was then forensically examined by "Det. James Kennedy or any agency certified and capable of conducting such examinations." *See* Garcia Warrant Appl. at 6–7. Just as in *In re 650 Fifth Ave.*, "there is no evidence that anyone" conducting the forensic examination of the cell phone's contents "reviewed the [Cintron & Heanue] affidavit before the search." 934 F.3d at 163.

Indeed, Garcia represents that the FBI obtained the cell phone seized pursuant to the September 5th warrant at an unknown time, but years after warrant was executed, and extracted the entire contents of Garcia's cell phone. Def.'s Mem. at 4–5. There is no indication that the FBI was aware of or carried out its extraction in accordance with any parameters set forth in the September 5th warrant package, which seems an obvious conclusion since the warrant package, to include the affidavit, set no parameters. Although the affidavit identified the crime under investigation, this is the *only* deficiency that could be corrected by resort to the application. The affidavit sought permission to seize and search "all electronic devices to include all cellular phones." Garcia Warrant Appl. at 6. It contained no restriction as to the devices to be searched, the contents to be seized, or the temporal scope of the data to be searched. As all but conceded by the affiants, this warrant simply sought the cell phone of a suspect to search for whatever evidence it might harbor. *See* Garcia Warrant Appl. at 4 ("Your affiants believe that Luis Garcia's cellular phone contains information that can aid investigators in the furtherance of this homicide investigation.").[13] As discussed above, the Fourth Amendment demands more, and objectively reasonable officers would know as much.

Accordingly, given that this warrant was not supported by probable cause, was not sufficiently particularized, and was extraordinarily overbroad, the Court finds that the warrant was so defective that the detectives had no objectively reasonable basis for relying upon it. *Cf. United States v. Harvey*, No. 21-CR-335 (SJ), 2022 WL 684050, at *10 (E.D.N.Y. Mar. 8, 2022) ("Considering [the warrant's] lack of temporal limitation, combined with the questionable existence of probable cause, the Social Media Warrant appeared to authorize precisely the type of

---

[13] The Government argues that this same phrase limited the scope of the warrant to evidence of the crime in question. *See* Gov.'s Opp'n at 49–50. That is not a reasonable reading of the affidavit. This clause did not place a limitation on the scope of the search, but was offered as the reason for the requested warrant.

exploratory rummaging the Fourth Amendment protects against." (internal quotations and citation omitted)). And where, as here, none of these obvious deficiencies were identified in the warrant preparation and review process, there is an indication of "grossly negligent disregard for Fourth Amendment rights." *See In re 650 Fifth Ave.*, 934 F.3d at 164 (quotations omitted). As such, the purpose of the exclusionary rule—deterrence of such conduct in the future—is implicated, and therefore the exclusionary rule should apply.

**CONCLUSION**

For the foregoing reasons, Defendant Garcia's motion to suppress, ECF No. 571, is GRANTED.

**SO ORDERED** at Bridgeport, Connecticut, this 28th day of July, 2023.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE